IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA



RYAN KARNOSKI, *et al.*,

      Plaintiffs, and

STATE OF WASHINGTON,

      Plaintiff-Intervenor,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al.*,

      Defendants.

Misc. No. 1:20 mc 13

Underlying Action: Case No. 2:17-
cv-01297-MJP (W.D. Wa.)

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO QUASH THIRD-PARTY SUBPOENA ISSUED TO WILLIAM F. MORAN, FORMER VICE CHIEF OF NAVAL OPERATIONS

# TABLE OF CONTENTS

I.     STATEMENT OF THE CASE ................................................................... 1

II.    STATEMENT OF FACTS ...................................................................... 2

    A.    DoD Policy Regarding Military Service by Transgender Individuals and Individuals with Gender Dysphoria ........................................................ 3

    B.    Underlying Litigation ................................................................... 6

III.   STATEMENT OF QUESTIONS PRESENTED ...................................... 8

IV.   ARGUMENT ........................................................................................ 9

    A.    Legal Standard ................................................................................ 9

    B.    The Apex Doctrine Bars Plaintiffs from Deposing Admiral Moran Absent Exceptional Circumstances. ........................................................ 10

        1.    Former High-Ranking Officials Are Generally Exempt from Testifying About Their Official Decisions. ..................................... 10

        2.    Admiral Moran Is a Former High-Ranking Official. ........................ 13

    C.    High Ranking Depositions Are Especially Inappropriate In This Case In Light of the Deference Owed by Courts to Military Judgments. ........................................................................................ 15

    D.    Plaintiffs Cannot Establish that Exceptional Circumstances Require Admiral Moran's Deposition. ................................................................ 17

        1.    Admiral Moran Does Not Possess Any Unique, First-Hand Knowledge About DoD's Current Policy. ....................................... 18

        2.    Plaintiffs Can Readily Obtain Information About the Panel's Deliberations From Alternate Sources. ........................................... 19

        3.    Any Other Information Plaintiffs Seek Is Privileged or Protected. ........................................................................................ 22

CONCLUSION ................................................................................................... 24

i

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. FBI,*
    186 F.R.D. 1 (D.D.C. 1998) ........................................................................ 13

*Bagley v. Blagojevich,*
    486 F. Supp. 2d 786 (C.D. Ill. 2007) ......................................................... 18

*Bogan v. City of Boston,*
    489 F.3d 417 (1st Cir. 2007) ...................................................................... 21

*Byrd v. District of Columbia,*
    259 F.R.D. 1 (D.D.C. 2009) ....................................................................... 13

*Cipollone v. Liggett Group, Inc.,*
    812 F.2d 1400 (table) (4th Cir. 1987) ........................................................ 22

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................................... 11

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ................................................................ 12, 17, 22

*Detoy v. City and Cnty of S.F.,*
    196 F.R.D. 362 (N.D. Cal. 2000) ............................................................... 18

*Doe v. Esper (Doe DC),*
    No. 1:17-cv-1597, 2019 WL 4394842 (D.D.C. Sept. 13, 2019) ............... 7, 19

*Doe v. Shanahan (Doe DC),*
    917 F.3d 694 (D.C. Cir. 2019) .................................................... 3, 4, 16, 23

*FDIC v. Galan-Alvarez,*
    No. 15-mc-00752, 2015 WL 5602342 (D.D.C. Sept. 4, 2015) ........ 11, 12, 13, 21

*Franklin Sav. Ass'n v. Ryan,*
    922 F.2d 209 (4th Cir. 1991) ................................................................ 10, 22

*Gilligan v. Morgan,*
    413 U.S. 1 (2008) ....................................................................................... 16

ii

*Goldman v. Weinberger,*
    475 U.S. 503 (1986) ............................................................................................15, 16

*In re Cheney,*
    544 F.3d 311 (D.C. Cir. 2008) .......................................................................10

*In re Commodity Future Trading Comm'n,*
    941 F.3d 869 (7th Cir. 2019)........................................................................10

*In re McCarthy,*
    636 F. App'x 142 (4th Cir. 2015) ..............................................................9, 10

*In re United States (Holder),*
    197 F.3d 310 (8th Cir. 1999)...................................................................10, 21

*Intelligent Verification Sys., LLC v. Microsoft Corp.,*
    No. 2:12:cv525, 2014 WL 12544827 (E.D. Va. Jan. 9, 2014)...........................9, 17, 21

*K.C.R. v. Cty. of Los Angeles,*
    No. CV 13-3806, 2014 WL 3434257 (C.D. Cal. July 11, 2014) ...................................12

*Karnoski v. Trump,*
    926 F.3d 1180 (9th Cir. 2019)..........................................................3, 5, 7, 17

*Lederman v. N.Y.C. Dep't of Parks & Recreation,*
    731 F.3d 199 (2d Cir. 2013)..................................................................*passim*

*Low v. Whitman,*
    207 F.R.D. 9 (D.D.C. 2002)....................................................................13, 15

*Rostker v. Goldberg,*
    453 U.S. 57 (1981).............................................................................15, 16

*Sarma v. Wells Fargo & Co.,*
    No. 1:15-MC-63, 2016 WL 410013 (M.D.N.C. Feb. 2, 2016)........................................9

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20 (1984).....................................................................................9

*Simplex Time Recorder Co. v. Sec'y of Labor,*
    766 F.2d 575 (D.C. Cir. 1985) ............................................................10, 15, 21

*Sykes v. Brown,*
    90 F.R.D. 77 (E.D. Pa. 1981).......................................................................12

iii

*Thomas v. Cate*,
   715 F. Supp. 2d 1012 (E.D. Cal. 2010) .......................................................................... 12

*Thomasson v. Perry*,
   80 F.3d 915 (4th Cir. 1996) ........................................................................................... 16

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) .................................................................................................. 16

*United States v. Morgan*,
   313 U.S. 409 (1941) ........................................................................................ 10, 11, 22

*United States v. Sensient Colors, Inc.*,
   649 F. Supp. 2d 309 (D.N.J. 2009) ......................................................................... 11, 15

*United States v. Wal-Mart Stores*,
   No. CIV.A. PJM-01-1521, 2002 WL 562301 (D. Md. Mar. 29, 2002) ............ 11, 12, 13

*Va. Dep't of Corrections v Jordan*,
   921 F.3d 180 (4th Cir. 2019) ........................................................................................... 9

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ...................................................................................................... 11

*Walker v. NCNB Nat'l Bank of Fla.*,
   810 F. Supp. 11 (D.D.C. 1993) ..................................................................................... 12

*Winter v. NRDC*,
   555 U.S. 7 (2008) ..................................................................................................... 15, 16

## Rules

Fed. R. Civ. P. 26 ................................................................................................................ 9

Fed. R. Civ. P. 45 ................................................................................................................ 9

Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv) ........................................................................... 9, 22

## Regulations

82 Fed. Reg. 41,319 (Aug. 30, 2017) ............................................................................... 11

iv

## Other Authorities

Secretary of the Navy, Thomas P. Dee, (2020), https://www.secnav.navy.mil/donhr/
About/Senior-Executives/Biographies/Dee,%20T.pdf.......................................................20

v

# I. STATEMENT OF THE CASE

Pursuant to Rules 26(c)(1) and 45(d)(3) of the Federal Rules of Civil Procedure, Defendants in the above-captioned action move to quash a subpoena ordering William F. Moran, the former Vice Chief of Naval Operations, to appear for a deposition on May 28, 2020 in this District. *See* Notice of Subpoena ("Moran Subpoena"), attached hereto as Ex. A. Admiral Moran is not a party to the underlying action at issue here, *Karnoski v. Trump*, No. 2:17-cv-01297-MJP (W.D. Wash.) ("*Karnoski*"), which challenges the Department of Defense's ("DoD") policy on military service by transgender individuals and individuals with a medical condition called gender dysphoria. Plaintiffs seek to depose Admiral Moran in order to probe his role in the development of the challenged policy when he held the position of Vice Chief of Naval Operations. Under well-established law, this subpoena should be quashed. Notably, the Ninth Circuit has issued a prior writ of mandamus limiting discovery in *Karnoski*, which weighs heavily against granting the requested deposition, and that court is presently considering a second mandamus petition concerning the scope of remaining discovery, which could also impact whether the requested deposition is proper.

Moreover, granting Plaintiffs' request would conflict with long-standing precedent even in ordinary cases, and would be especially extraordinary in a challenge to military personnel policy. The Admiral's deposition is entirely inconsistent with the "apex doctrine," which protects high-ranking officials (both current and former) from testifying about their official decisions. And the separation-of-powers concerns underlying that doctrine are especially acute here, where Plaintiffs seek his deposition in order to probe

1

deliberations concerning a military personnel policy. The fact that Defendants have already produced all relevant, non-privileged documents necessary to litigate Plaintiffs' claims, in addition to privileged documents pursuant to court orders, and have made available several other senior DoD and Armed Forces officials with personal knowledge of the challenged policy's development, further eliminates any need for the Admiral's deposition. For these compelling reasons, set forth further below, the Court should quash the deposition subpoena for Admiral Moran.

## II.     **STATEMENT OF FACTS**

The underlying action, *Karnoski*, is one of four long-running cases challenging the constitutionality of DoD's policy concerning military service by transgender individuals and individuals with gender dysphoria. *See Stockman v. Trump*, No. 1:17-cv-6516, (C.D. Cal. Sept. 5, 2017); *Stone v. Trump*, No. 1:17-cv-02459 (D. Md. Aug. 28, 2017); *Doe v. Esper*, No. 17-cv-1597 (D.D.C. Aug. 9, 2017) (hereinafter *Doe DC*); *see also Doe v. Esper*, No. 1:20-cv-105030 (*Doe MA*) (D. Mass. Mar. 17, 2020) (recent action for a preliminary injunction). All four cases are in discovery and have in place a cross-sharing agreement. *See* Stipulated Uniform Protective Order and Cross-Use Agreement, *Karnoski*, 2:17-cv-01297-MJP (W.D. Wash. Feb. 14, 2018), ECF 183.[1]

---

[1] Unless otherwise indicated, all citations to the docket refer to the underlying action, *Karnoski v. Trump*, No. 2:17-cv-01297-MJP (W.D. Wash.).

2

**A.** **DoD Policy Regarding Military Service by Transgender Individuals and Individuals with Gender Dysphoria**

In February 2018, then-Secretary James Mattis issued the current DoD policy regarding military service by transgender individuals and individuals with gender dysphoria. *Karnoski v. Trump*, 926 F.3d 1180, 1187–88 (9th Cir. 2019) (per curiam). The current policy permits transgender individuals to serve, but presumptively disqualifies certain individuals on the basis of a medical condition—gender dysphoria—and its treatment. As described below, the current policy, which is the product of comprehensive review by high-ranking military officials, came after several recent developments in the military's policy.

In June 2016, following a review of the military's longstanding categorical ban on retention of transgender service members or their accession into—that is, their joining—the military, then-Secretary of Defense Ashton Carter ordered the armed forces to revise their standards to permit military service by transgender individuals under certain circumstances, depending on whether an individual had been diagnosed with "gender dysphoria," a psychological condition that "refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender," Diagnostic and Statistical Manual of Mental Disorders Fifth Edition, DSM-5 ("DSM-5") at 451, attached hereto as Ex. B. *See Doe DC v. Shanahan*, 917 F.3d 694, 710–11 (D.C. Cir. 2019) (Williams, J., concurring in result) (describing the Carter policy).

On June 30, 2017, before the Carter policy's accession standards were set to take effect, then-Secretary Mattis decided, based on the recommendations of the Secretaries of

3

the Military Departments and the Chiefs of the Military Services and in the exercise of his discretion, that it was "necessary to defer" the Carter accession standards until January 1, 2018, so that the military could "evaluate more carefully" the effect of accessions by transgender individuals "on readiness and lethality." Memorandum from Secretary Mattis to President Trump ("Mattis Mem.") (Feb. 22, 2018) at 1, attached hereto as Ex. C; *see also Doe DC*, 917 F.3d at 713 (Williams, J., concurring in result).

While this review was ongoing, the President stated on Twitter on July 26, 2017, that the military "will not accept or allow Transgender individuals to serve in any capacity." *Doe DC*, 917 F.3d at 698. He then issued a memorandum in August 2017 explaining that former Secretary Carter had "failed to identify a sufficient basis to conclude that terminating the Department's longstanding policy"—which generally disqualified transgender individuals from service—"would not hinder military effectiveness and lethality, disrupt unit cohesion, or tax military resources." *Id.* (quotation omitted). The President's 2017 memorandum reinstituted the military's longstanding policy disqualifying those individuals, but in doing so, made clear that the Secretary could "advise [the President] at any time, in writing, that a change to this policy is warranted." *See* Memorandum of August 25, 2017, 82 Fed. Reg. 41,319, 41,319 (Aug. 30, 2017).

Secretary Mattis established a Panel of Experts ("the Panel") to "conduct an independent multi-disciplinary review and study of relevant data and information pertaining to transgender Service members." DoD Report and Recommendations on Military Service by Transgender Persons (Feb. 2018) ("DoD Report") at 17, attached hereto as Ex. D. The Panel consisted of "senior uniformed and civilian Defense

4

Department and U.S. Coast Guard leaders," Mattis Mem. at 1, of which Admiral Moran was a voting member, *see* Decl. of William F. Moran ("Moran Decl.") (describing the Admiral's involvement on the Panel), attached hereto as Ex. E. Through thirteen meetings over ninety days, the Panel met with commanders of transgender service members, military medical professionals, civilian medical professionals, and transgender service members. *See Karnoski*, 926 F.3d at 1191. The Panel reviewed information regarding gender dysphoria and its treatment, as well as data collected after the announcement of the Carter policy. *Id.* The Panel further received briefings from three "working groups" dedicated to specific issues involving personnel, medical treatment, and military lethality. DoD Report at 18.

The Panel developed a new policy, *see id.* at 32, which Secretary Mattis adopted in full and is now in effect, *see id.* at 4 (confirming that the Department's policy is "[c]onsistent with [the Panel's] recommendations"). Like the Carter policy before it, DoD's current policy turns on the medical condition of gender dysphoria, not on transgender status. Under each policy, transgender individuals without a history or diagnosis of gender dysphoria may serve if they meet the standards associated with their biological sex, whereas those with gender dysphoria are presumptively disqualified. *Id.* at 4-6. The main difference between the two policies is the nature of the exceptions to that presumptive disqualification. Under the current policy, individuals with a history or diagnosis of gender dysphoria may join or remain in the military if they neither have undergone gender transition nor seek to do so. *Id.* at 5. In addition, for accession into the military, they must show 36 months of stability (as opposed to 18 months of stability under

5

the Carter policy) before applying, while for retention in the military, they may remain if they meet deployability standards. *Id.* By contrast, those with gender dysphoria who have undergone gender transition or seek to do so are disqualified, absent a waiver. *Id.* Recognizing, however, that a number of individuals with gender dysphoria had "entered or remained in service following the announcement of the Carter policy," DoD included a reliance exemption in its current policy. *Id.* at 43.

Secretary Mattis conveyed the Panel's proposed policy to the President in a memorandum dated February 22, 2018 that was accompanied by DoD's Report and detailed the bases for the proposal. *See* Mattis Mem. He stated that the policy that the Panel developed was also consistent with his "professional judgment." *Id.* at 3. The Secretary requested that the President "revoke" his 2017 memorandum to permit the military to adopt the new approach. *Id.* at 1. On March 23, 2018, the President revoked the 2017 memorandum, permitting the current policy to go into effect.

**B.      Underlying Litigation**

Plaintiffs filed this action in August 2017 to challenge the President's 2017 Twitter announcement and 2017 memorandum. *See* Compl., ECF 1. The district court preliminarily enjoined the directives in the memorandum. Order (Dec. 11, 2017), ECF 103. In April 2018, after the President revoked the directives, the *Karnoski* district court extended the injunction to DoD's current policy, stating that it "threaten[s] the very same violations." Order at 12 (Apr. 13, 2018), ECF 233.

Plaintiffs served broad discovery requests that sought, *inter alia*, "all documents and communications" relating to the military's deliberations on service by transgender

6

individuals. *See* Pls.' First Request for Production to Defs. ("RFP") (Dec. 29, 2017) at 1, 4, ECF 246-2; Pls.' Second RFP (Apr. 26, 2018) at 2–3, ECF 269-2. The Government initially submitted a partially redacted Administrative Record and produced approximately 30,000 non-privileged documents, while withholding thousands of documents protected by the deliberative process privilege. In July 2018, the district court compelled the production of all documents withheld under the deliberative process privilege. Order (Jul. 27, 2018), ECF 299. The Government challenged both the preliminary injunction and the discovery order before the Ninth Circuit.

The Ninth Circuit vacated the preliminary injunction, holding that DoD's 2018 policy "is significantly different" from the President's 2017 memorandum barring transgender individuals from serving "in both its creation and its specific provisions." *Karnoski*, 926 F.3d at 1199. It also issued a writ of mandamus vacating the district court's discovery order. *Id.* at 1203–08. The Ninth Circuit directed "careful consideration [of] executive branch privileges," concluding that "the military's interest in full and frank communication about policymaking raises serious—although not insurmountable—national defense interests." *Id.* at 1206.

Separately, in September 2019, the district court for the District of Columbia, in the related *Doe v. Esper* litigation, concluded that the *Doe DC* plaintiffs had overcome the deliberative process privilege for documents that were used or considered by the Panel in developing DoD's current policy. *See Doe DC v. Esper*, No. 1:17-cv-1597, 2019 WL 4394842, at *8–10 (D.D.C. Sept. 13, 2019). Though the Government disagreed with that order, Defendants produced an unredacted version of the Administrative Record,

7

unredacted meeting minutes from the Panel, and all deliberative documents and communications to, from, generated by, presented to, or reviewed by the Panel. Defs.' Notice at 1, ECF 389. That production was shared with the Plaintiffs in this action. *See* Easton Decl. ¶ 6, ECF 405-2; Stipulated Uniform Protective Order and Cross-Use Agreement, ECF 183.

Notwithstanding the above production and the Ninth Circuit's writ of mandamus, the district court in this action again ordered Defendants to produce thousands of additional documents that were never seen or considered by the Panel that developed the current policy and also ordered that witnesses at depositions must provide information protected by the deliberative process privilege. *See* Order (Dec. 18, 2019), ECF 401; Minute Entry (Feb. 3, 2020), ECF 410; Order (Feb. 7, 2020), ECF 413. Those orders are currently the subject of another pending mandamus petition before the Ninth Circuit, which has issued an administrative stay of the district court's orders in this action. *See* Order, *In re Trump*, No. 20-70365, ECF 415 (9th Cir. Feb. 12, 2020).

On April 30, 2020, Plaintiffs served Admiral Moran with a third-party subpoena pursuant to Rule 45, seeking his deposition testimony on May 28, 2020, in Greensboro, North Carolina. *See* Moran Subpoena. Pursuant to Local Rule 37.1, the parties met and conferred, and Plaintiffs have agreed to stay the compliance date of the subpoena pending this Court's resolution of the instant motion to quash.

## III. STATEMENT OF QUESTIONS PRESENTED

1. Does the apex doctrine presumptively preclude Plaintiffs from deposing Admiral Moran about his role in formulating the challenged military policy?

8

2. Have Plaintiffs demonstrated that extraordinary circumstances necessitate the Admiral's deposition when Defendants have already turned over all relevant non-privileged documents, privileged documents pursuant to court orders, and offered other senior DoD and Armed Forces officials to testify?

## IV.     ARGUMENT

### A.     Legal Standard

Federal Rule of Civil Procedure 45 governs subpoenas issued to non-parties. *See* Fed. R. Civ. P. 45. Under Rule 45, the Court "must quash or modify a subpoena that . . . subjects a person to undue burden," or that "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45(d)(3)(A)(iii) & (iv). Because the "scope of discovery under Rule 45 tracks Rule 26," a non-party "may seek from the court protection from discovery via the overlapping and interrelated provisions of both Rules 26 and 45," *Sarma v. Wells Fargo & Co.*, No. 1:15-MC-63, 2016 WL 410013, at *6 (M.D.N.C. Feb. 2, 2016) (citation omitted). Rule 26 grants trial courts broad discretion to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including to forbid the proposed discovery altogether. Fed. R. Civ. P. 26(c); *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984). Although the party moving to quash ordinarily bears the burden of persuasion, *Va. Dep't of Corrections v Jordan*, 921 F.3d 180, 189 (4th Cir. 2019), where, as discussed below, the subpoena is issued to a high-ranking government official, courts require the party seeking to depose the official to demonstrate that "extraordinary circumstances" justify the deposition, *see In re McCarthy*, 636 F. App'x

9

142, 143 (4th Cir. 2015); *Intelligent Verification Sys., LLC v. Microsoft Corp.*, No. 2:12:cv525, 2014 WL 12544827, at * 2 (E.D. Va. Jan. 9, 2014).

## B. The Apex Doctrine Bars Plaintiffs from Deposing Admiral Moran Absent Exceptional Circumstances.

### 1. Former High-Ranking Officials Are Generally Exempt from Testifying About Their Official Decisions.

Since the Supreme Court's decision in *United States v. Morgan*, 313 U.S. 409 (1941), courts have routinely held under the "apex doctrine" that high-ranking government officials, both current and former, should not—absent exceptional circumstances—be deposed or called to testify regarding their reasons for taking official action. *See, e.g., Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991); *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203–04 (2d Cir. 2013); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586–87 (D.C. Cir. 1985). In *Morgan*, the Supreme Court countermanded the district court's order permitting the deposition of the Secretary of Agriculture on his process in reaching an official decision, admonishing that he "should have never been subjected to this examination" because it was improper "to probe [his] mental processes." 313 U.S. at 421–22.

Consistent with *Morgan*, the Fourth Circuit and other courts of appeals have issued the extraordinary remedy of a writ of mandamus to preclude the depositions of high-ranking Executive branch officials. *See, e.g., In re McCarthy*, 636 F. App'x at 145 (EPA Administrator); *In re Commodity Future Trading Comm'n*, 941 F.3d 869, 875 (7th Cir. 2019) (CFTC chairman, commissioners, and staff); *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (Vice President's Chief of Staff); *In re United States (Holder)*, 197 F.3d 310,

10

316 (8th Cir. 1999) (Attorney General and Deputy Attorney General). And numerous courts have similarly precluded depositions of former high-ranking officials regarding their decision-making while in office. *See, e.g., Lederman*, 731 F.3d at 203–04 (former deputy mayor); *FDIC v. Galan-Alvarez*, No. 15-mc-00752, 2015 WL 5602342, at *12 (D.D.C. Sept. 4, 2015) (former FDIC chairperson and senior deputy director); *United States v. Sensient Colors, Inc.*, 649 F. Supp. 2d 309, 316–18 (D.N.J. 2009) (former EPA Administrator); *United States v. Wal-Mart Stores*, No. CIV.A. PJM-01-1521, 2002 WL 562301, at *3–4 (D. Md. Mar. 29, 2002) (former chairperson of the Consumer Product Safety Commission). Three separate rationales underlie these protections.

*First*, constitutional separation-of-powers principles are implicated when parties litigating against federal agencies attempt to ascertain the thoughts and mental processes by which high-ranking agency officials exercise their official discretion. *See Morgan*, 313 U.S. at 422 ("Just as a judge cannot be subjected to such scrutiny, . . . so the integrity of the administrative process must be equally respected." (internal citations omitted)); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) ("[J]udicial inquiries into . . . executive motivation represent a substantial intrusion into the workings of other branches of government."). Challenges to agency policies are ordinarily resolved on the basis of the "administrative findings that were made at the same time as the decision"—as reflected in the Administrative Record that Defendants produced in this action. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). The Supreme Court has repeatedly confirmed that, absent "a strong showing of bad faith or improper behavior," discovery into "the mental processes of administrative

11

decisionmakers" is unwarranted. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (citation omitted).

*Second*, subjecting high-level government officials to depositions in civil actions involving their agency would impede the exercise of official duties by exerting a chilling effect on official decision-making. *See Lederman*, 731 F.3d at 203. That is, "subjecting officials to interrogation about how they reached particular decisions would impair that decision-making process by making officials less willing to explore and discuss all available options, no matter how controversial." *Walker v. NCNB Nat'l Bank of Fla.*, 810 F. Supp. 11, 12 (D.D.C. 1993); *see also Sykes v. Brown*, 90 F.R.D. 77, 78 (E.D. Pa. 1981).

*Third*, "a contrary rule might discourage otherwise upstanding individuals from public service." *Galan-Alvarez*, 2015 WL 5602342, at *4 (citation omitted). As multiple courts have recognized, absent limits on the depositions of high-ranking officials, there is "a tremendous potential for abuse or harassment." *K.C.R. v. Cty. of Los Angeles*, No. CV 13-3806, 2014 WL 3434257, at *3 (C.D. Cal. July 11, 2014) (quotation omitted); *see also Wal-Mart Stores*, 2002 WL 562301, at *4.

Courts have recognized that "[t]he apex doctrine is no less applicable to former officials than to current officials," even though any immediate "interference with official duties is absent." *Galan-Alvarez*, 2015 WL 5602342, at *3 (quoting *Thomas v. Cate*, 715 F. Supp. 2d 1012, 1049 (E.D. Cal. 2010)); *see also Wal-Mart*, 2002 WL 562301, at *3–4. As one court explained:

> The integrity of administrative proceedings and the underlying decisionmaking process of agency officials are just as important where the official to be questioned no longer serves in the same position. And

12

"indiscriminate depositions of high-ranking government officials would . . . likely discourage" people "from accepting positions as public servants" irrespective of whether those deposed were current or former officials.

*Galan-Alvarez*, 2015 WL 5602342, at *3 (quoting *Wal-Mart*, 2002 WL 562301, at *3). The concerns motivating the apex doctrine do not arbitrarily dissipate the moment the Admiral has retired; "[i]f the immunity *Morgan* affords is to have any meaning, the protections must continue upon the official's departure from public service." *Wal-Mart*, 2002 WL 562301, at *3.

### 2. Admiral Moran Is a Former High-Ranking Official.

As a retired four-star Admiral in the U.S. Navy and the former Vice Chief of Naval Operations ("VCNO"), Admiral Moran's position falls well within the confines of the apex doctrine, and he should therefore be protected from a sitting deposition absent extraordinary circumstances. Although there is no set standard for determining whether an official is sufficiently high-ranking to qualify under the apex doctrine, *see Byrd v. District of Columbia*, 259 F.R.D. 1, 6 (D.D.C. 2009), Admiral Moran's former position—which is the second-highest uniformed position in the Navy—undoubtedly satisfies the threshold. In conducting the apex analysis, courts have considered, among other things, the official's title, place in the governmental hierarchy, and job responsibilities. *See, e.g., Alexander v. FBI*, 186 F.R.D. 1, 3–4 (D.D.C. 1998) (determining that three officials classified as "Assistant[s] to the President" qualified as high-ranking officials upon consideration of "the nature of their positions at the White House"); *Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002) (concluding that the EPA's Deputy Chief of Staff is a high-ranking official

13

upon finding that, "[a]s a member of the Senior Executive Service with responsibility for budget, personnel, and resource issues, it is clear that [the Deputy Chief of Staff] is in a position of substantial authority").

As set forth in Admiral Moran's declaration, the position of VCNO entails the exercise of substantial responsibilities. Admiral Moran served as the "principal deputy" of the Chief Naval Officer ("CNO") in "maintain[ing], train[ing], and equip[ing] combat-ready Naval forces." *See* Moran Decl. ¶¶ 3–4. This included overseeing "all Navy assets, including over 400,000 military and civilian personnel and nearly 300 deployable battle force ships," in addition to more than a dozen offices in the Department of the Navy, which directly reported to the Office of the CNO. *Id.* ¶ 3. Because the CNO may, by law, "delegate or prescribe . . . duties to the VCNO," Admiral Moran also acted, in certain areas, "with the complete authority to represent and act" as the top uniformed Naval officer. *Id.* ¶ 4.

The position of VCNO also involves the exercise of substantial authority, particularly in areas where the CNO has delegated the VCNO the authority to act in his stead. Admiral Moran attests, for instance, that he "represented the CNO at various Joint Staff 'Tank' sessions, where representatives of all the military services discussed and initiated action on matters of military operations." *Id.* As the VCNO, Admiral Moran also "represented the CNO at frequent Office of the Secretary of Defense (OSD) Deputies meetings" and "often, [his] policy recommendations . . . were ultimately presented to the Secretary of Defense as official Navy positions." *Id.*

14

Given his stature and his former job responsibilities, the VCNO qualifies as a former high-ranking Government official whose deposition should only be allowed upon a showing of extraordinary circumstances.[2] Accordingly, Plaintiffs must overcome a high presumption in order to obtain Admiral Moran's deposition in this case.

**C.    High Ranking Depositions Are Especially Inappropriate In This Case In Light of the Deference Owed by Courts to Military Judgments.**

The foregoing concerns with the deposition of high-ranking officials are particularly acute in this case, where Plaintiffs seek to question and second-guess a former senior military official about his decisions affecting military personnel policy. As one of the "'complex, subtle, and professional decisions as to the composition . . . of a military force,' which are 'essentially professional military judgments,'" DoD's current policy is subject to a highly deferential form of review. *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citation omitted). Choices about who should serve "are based on judgments concerning military operations and needs, and the deference unquestionably due the latter judgments is necessarily required in assessing the former as well." *Rostker v. Goldberg*, 453 U.S. 57, 68 (1981) (citation omitted). "Judicial deference is at its apogee" in this area because "[n]ot only are courts ill equipped to determine the impact upon discipline that any particular intrusion upon military authority might have, but the military authorities have been charged

---

[2] Indeed, courts have extended the apex doctrine to preclude the depositions of officials (both current and former) of lower rank. *See, e.g.*, *Simplex Time Recorder Co.*, 766 F.2d at 586–87 (Regional Administrator of OSHA); *Sensient Colors, Inc.*, 649 F. Supp. 2d at 321 (former EPA Regional Administrator); *Low*, 207 F.R.D. at 12 (EPA Deputy Chief of Staff).

15

by the Executive and Legislative Branches with carrying out our Nation's military policy." *Goldman v. Weinberger*, 475 U.S. 503, 507–08 (1986) (citations and alterations omitted); *see also Thomasson v. Perry*, 80 F.3d 915, 926 (4th Cir. 1996). The judicial inquiry into challenges to military policy is thus "highly constrained." *Trump v. Hawaii*, 138 S. Ct. 2392, 2419–20 (2018); *see also Goldman*, 475 U.S. at 507–08.

Even testimony that "contradict[s]" the reasons behind a military policy would be "quite beside the point," so long as the policy had been "decided by the appropriate military officials" in "their considered professional judgment." *Goldman*, 475 U.S. at 509. And when such discovery has occurred, the Supreme Court has "chastised the district court" for "palpably exceed[ing] its authority" in "relying on [such] testimony." *Doe DC*, 917 F.3d at 737 (Williams, J., concurring in result) (first quoting *Goldman*, 475 U.S. at 509, then quoting *Rostker*, 453 U.S. at 81)).

There is no proper basis here for deposing current or former top military officials in order to probe their decision-making regarding the "composition . . . of a military force." *Winter*, 555 U.S. at 24 (citing *Gilligan v. Morgan*, 413 U.S. 1, 10 (2008)). To the contrary, as noted above, the case law is replete with examples where courts—including the Supreme Court—have rejected similar attempts to ascertain the mental impressions of high-ranking officials. *See supra* 10–11. The apex doctrine is particularly apposite where the Constitution envisions that the political branches have broad authority to develop and oversee military personnel policy.

16

**D.** **Plaintiffs Cannot Establish that Exceptional Circumstances Require Admiral Moran's Deposition.**

Plaintiffs' principal theory on their underlying claims in this action has been that DoD's current policy being challenged in this case merely provided "after-the-fact justification" for the President's initial Tweet and memorandum, *see* Pls.' Second Am. Compl. ¶¶ 205–07, ECF 347. But the Ninth Circuit rejected that theory, holding that the current policy "is significantly different from the [President's] 2017 Memorandum barring transgender individuals from serving "in both its creation and its specific provisions." *Karnoski*, 926 F.3d at 1199. Plaintiffs thus can challenge the current policy only on its own terms.

To demonstrate extraordinary circumstances warranting Admiral Moran's deposition, Plaintiffs must make a strong showing of "bad faith or improper behavior," *Dep't of Commerce*, 139 S. Ct. at 2573–74, or, at minimum, demonstrate that the Admiral has additional non-privileged knowledge relevant to the underlying challenge, and that the information cannot be obtained elsewhere, *see Lederman*, 731 F.3d at 204; *Microsoft*, 2014 WL 12544827, at * 2. Plaintiffs have not specified why they wish to depose the Admiral, nor do they even allege that he acted in bad faith. Instead, Plaintiffs broadly assert that Admiral Moran's testimony is "critically important" because he was "a very senior and active member of the Panel" that formulated the policy. *See* Joint Status Report ("JSR") (May 13, 2020) at 3, attached hereto as Ex. F. That is plainly insufficient, and the subpoena should be quashed on that basis alone.

17

### 1. Admiral Moran Does Not Possess Any Unique, First-Hand Knowledge About DoD's Current Policy.

As a threshold matter, courts have required Plaintiffs to demonstrate that a high-ranking official has "unique or special knowledge of the facts at issue" in order to overcome the apex doctrine's protections. *See Microsoft*, 2014 WL 12544827, at *2; *see also Lederman*, 731 F.3d at 203. Here, Admiral Moran states in his declaration that he does not have any specialized knowledge about the challenged DoD policy that would justify his deposition. The Admiral served as one of seventeen voting members on the Panel, five of whom were also from the Navy. *See* Moran Decl. ¶ 8. In that capacity, he—like all the other voting members—listened to presentations, engaged in deliberations, and voted on various recommendations regarding military service by transgender individuals and individuals with gender dysphoria. *Id.* In fact, unlike some of the witnesses whose testimony the Government has offered to Plaintiffs, the Admiral did not have a specialized role or leadership position on the panel. *See id.* ¶ 9 (attesting that the he did not chair the panel or any of its working groups). And, he expressly attests that he was not substantially involved in drafting the Panel's recommendations to Secretary Mattis. *See id.* ¶ 10. Accordingly, Plaintiffs cannot demonstrate why Admiral Moran's deposition testimony is essential to their case in order to overcome the heavy presumption against his testimony under the apex doctrine.[3]

---

[3] Courts have held, for example, that the presumption against testifying is overcome where an official acted in retaliation or personally intervened in the decision-making process. *See, e.g.*, *Bagley v. Blagojevich*, 486 F. Supp. 2d 786, 789-90 (C.D. Ill. 2007); *Detoy v. City and Cnty of S.F.*, 196 F.R.D. 362, 370 (N.D. Cal. 2000). That is far from the case here.

18

### 2. Plaintiffs Can Readily Obtain Information About the Panel's Deliberations From Alternate Sources.

In any event, all relevant, non-privileged information that Admiral Moran possesses can be obtained from other sources. To begin, Defendants have produced an unredacted Administrative Record in addition to over 30,000 non-privileged documents. Defendants have also produced every deliberative document sent from, received by, generated by, presented to, or considered by the Panel that formulated DoD's policy. These include:

- Unredacted meeting minutes from the Panel;

- All documents, testimony, and data reviewed by members of the Panel and the Panel's deliberations about these materials; and

- All documents and communications related to the Panel's work that were sent from, received by, generated by, presented to, or considered by the members of the Panel.

*See* Def's. Notice at 2–3, ECF 389; *Doe DC*, 2019 WL 4394842, at *8–10. Defendants have also waived the deliberative process privilege and produced the final versions of the presentations given by the Panel to the Deputy Secretary of Defense, the Vice Chairman of the Joint Chiefs of Staff, and Secretary Mattis. *See* Decl. of Andrew E. Carmichael ¶ 2, ECF 381 at 2–3. Accordingly, Plaintiffs already have access to all of the relevant documents necessary to litigate their claim that the "policy is not supported by any compelling, important, or even rational government interest," Pls. Second Am. Compl. ¶ 205, ECF 347, especially in light of the principles of military deference. Plaintiffs possess not only the Panel's deliberations, but also the information that the Panel presented to Secretary Mattis, who adopted the Panel's recommendations in full.

19

Moreover, Defendants have offered several other senior DoD and Armed Forces officials as witnesses to testify on the development of the challenged policy. Defendants have made available Anthony M. Kurta, the former Deputy Assistant Secretary of Defense for Military Personnel Policy, and Lernes Hebert, the current Deputy Assistant Secretary of Defense for Military Personnel Policy. *See* ECF 504-5 at 12. In the fall of 2017, Mr. Kurta performed the duties of the Under Secretary of Defense for Personnel and Readiness, and, in that role, served as chair of the Panel until the Under Secretary was confirmed in late November 2017; thereafter, Mr. Kurta remained a voting member of the Panel. ECF 504-6 at 1. Defendants have identified Mr. Kurta as the official who presented the Panel's recommendations to the Deputy Secretary of Defense and the Vice Chairman of the Joint Chiefs of Staff, and Mr. Hebert as the official who directly supported Mr. Kurta in that briefing and attended Panel meetings. ECF 504-5 at 12; ECF 504-6 at 2. In addition, Plaintiffs have already sought, and Defendants have provided, dates for the depositions of a number of other officials who were members of, or were significantly involved on, the Panel. Specifically, Defendants have made available Thomas Dee, who served as a Panel member, ECF 503 at 12, and at the time, was performing the duties of the Under Secretary of the Navy, *see* Thomas P. Dee, https://www.secnav.navy.mil/donhr/About/Senior-Executives/Biographies/Dee,%20T.pdf (last visited May 8, 2020), as well as Dr. Terry Adirim and Stephanie Miller, who were both senior DoD officials and who presented at and attended Panel meetings, ECF 503 at 12; ECF 504-6 at 2.

Given their personal involvement on the Panel, these officials can provide non-privileged testimony to—and, indeed, may be even better-situated to answer—questions

20

Plaintiffs may have about the Panel's actions and information that the Panel considered in formulating its recommendations, which then-Secretary Mattis adopted in full. At a minimum, the Court should require Plaintiffs to complete their depositions of Mr. Kurta, Mr. Hebert, Mr. Dee, Dr. Adirim, and Ms. Miller *before* requesting to depose Secretary Mattis. *See, e.g., Bogan v. City of Boston*, 489 F.3d 417, 424 (1st Cir. 2007) (holding it was "incumbent on [plaintiff] to seek information from [other officials] before turning to the Mayor").

In light of the above, Plaintiffs' proposed deposition of Admiral Moran is patently unnecessary, and indeed, inappropriate. Courts have made clear that "other less burdensome avenues for obtaining the information" must be "exhausted" before authorizing a sitting deposition. *Microsoft*, 2014 WL 12544827, at * 2 (citation omitted); *see also Simplex*, 766 F.2d at 587 (no extraordinary circumstances exist where party failed to show information was unavailable "from published reports and available agency documents"). Courts have, moreover, refused to authorize depositions or live testimony of high-ranking officials—both current and former—if "other persons can provide the information sought." *In re Holder*, 197 F.3d at 314; *see also Galan-Alvarez*, 2015 WL 5602342, at *5 (granting motion to quash subpoena seeking testimony from the FDIC Chairperson upon finding that the FDIC had "made available four other officials, all of whom had greater involvement in the day-to-day progress of the bank's closure").

The Court should do the same here. Not only have Plaintiffs already received all of the relevant, non-privileged documents necessary to litigate their claims, they have also obtained the deliberative material from the Panel that Secretary Mattis tasked with

21

formulating the challenged policy. Further, Plaintiffs have indicated that they will be taking Mr. Kurta's and Mr. Hebert's deposition later this summer, *see* JSR at 5–6, and scheduled dates for the depositions of numerous other DoD officials who were involved in the Panel's work, ECF 503 at 12. Plaintiffs can offer no reason, then, why the deposition of Admiral Moran is necessary.

### 3. Any Other Information Plaintiffs Seek Is Privileged or Protected.

To the extent Plaintiffs seek to depose Admiral Moran about his thought process in voting on the Panel's recommendations or other deliberations outside of the Panel's process that he may have been privy to, the Court should quash the subpoena because that information is clearly privileged or protected. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii).

**The Admiral's Thought Process.** As noted above, discovery into the Admiral's mental impressions is squarely foreclosed by the apex doctrine. *See supra* 10–11; *see also Franklin Sav. Ass'n*, 922 F.2d at 211 ("[A]bsent 'extraordinary circumstances,' a government decision-maker will not be compelled to testify about his mental processes in reaching a decision, 'including the manner and extent of his study of the record and his consultations with subordinates.'" (quoting *Morgan*, 313 U.S. at 421–22)). Plaintiffs cannot make the "strong showing of bad faith or improper behavior" that would be required to probe the Admiral's judgment. *Dep't of Commerce*, 139 S. Ct. at 2573–74. Despite vigorous litigation across five cases over nearly three years, there is no suggestion that Admiral Moran behaved improperly while serving on the Panel. Nor do Plaintiffs even make that allegation. And here, Plaintiffs already have access to the Panel's deliberations. Accordingly, Plaintiffs have no basis to examine Admiral Moran's mental processes.

22

**DoD Deliberations.** Moreover, any information that Plaintiffs seek regarding deliberations outside of the Panel's development of the policy would be protected by the deliberative process privilege, and Plaintiffs have no basis to overcome that privilege here. *See Cipollone v. Liggett Group, Inc.*, 812 F.2d 1400 (table) (4th Cir. 1987) (per curiam). As the *Doe DC* district court explained, the request for deliberative documents without any connection to Panel members is an improper "fishing" expedition. Tr. of Telephone Conference, *Doe DC v. Esper*, at 20:1–13 (D.D.C. Jan. 14, 2020), ECF 293; *accord Doe DC*, 917 F.3d at 737 (Williams, J., concurring in result) (noting that "the court should not bless (or invite) a futile fishing expedition into the executive's decision-making"). Given that the Panel's recommendations were the same policy adopted in the Report to Secretary Mattis and in Secretary Mattis's memorandum presenting the policy to the President, Plaintiffs have no need for deliberative information outside of the Panel's activities to understand if the current policy reflects the Panel's recommendations.

In fact, the Government has filed a mandamus petition in the Ninth Circuit seeking to vacate the district court's orders in the underlying action compelling the release of deliberative records never considered by the Panel, such as drafts of DoD's Report and deliberative documents relating to the Mattis memorandum. *See* Petition at 24, 25, *In re Trump*, No. 20-70365, ECF 1-2 (9th Cir. Feb. 11, 2020). That petition is currently pending. To the extent that Admiral Moran is privy to any deliberations outside of the Panel's process, then, this Court should not allow Plaintiffs to circumvent the Ninth Circuit's administrative stay by compelling the Admiral to testify about the kind of privileged information contained in those documents.

23

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Quash should be granted, and

Plaintiffs should be precluded from deposing Admiral Moran.

Dated: May 14, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs
Branch

GRACE X. ZHOU
(N.Y. Bar No. 5623681)
CHRISTOPHER D. EDELMAN
ANDREW E. CARMICHAEL
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 616-8267
Email: grace.x.zhou@usdoj.gov

*Counsel for Defendants*

24

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RYAN KARNOSKI, *et al.*,

    Plaintiffs, and

STATE OF WASHINGTON,

    Plaintiff-Intervenor,

v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
*et al.*,

    Defendants.

Misc. No. _____

Underlying Action: Case No. 2:17-
cv-01297-MJP (W.D. Wash.)

## CERTIFICATE OF WORD COUNT

I certify that this Brief complies with the word count limit set forth in L.R. 7.3(d). The number of words in this Brief, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Brief, does not exceed 6,250 words.

Dated: May 14, 2020

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO

25

Deputy Director, Federal Programs
Branch

GRACE X. ZHOU
(N.Y. Bar No. 5623681)
CHRISTOPHER D. EDELMAN
ANDREW E. CARMICHAEL
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Tel: (202) 616-8267
Email: grace.x.zhou@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2020, a copy of the document above was served by email to the following counsel of record for Plaintiffs and Plaintiff-Intervenor in the underlying action:

Jordan M. Heinz
KIRKLAND & ELLIS (IL)
300 North Lasalle
Chicago, IL 60654
312-862-2000
Email:Jheinz@kirkland.Com

*Counsel for Plaintiffs*


Chalia I. Stallings-Ala'ilima
OFFICE OF THE WASHINGTON ATTORNEY GENERAL
800 5th Ave, Ste 2000
Seattle, WA 98104-3188
206-464-7744
Email:Chalias@atg.Wa.Gov

*Counsel for Plaintiff-Intervenor*


A copy of the document above was also transmitted by email to additional counsel at the following addresses:

Vanessa Barsanti, vanessa.barsanti@kirkland.com
Mark Beckington, Mark.Beckington@doj.ca.gov
Ben Bistricer, Ben.Bistricer@lw.com
Lara Haddad, Lara.Haddad@doj.ca.gov
Mariaane F. Kies, MKies@cov.com
Peter Komorowski, PKomorowski@cov.com
Chloe Korban, Chloe.Korban@lw.com
Nicholas M. Lampros, nlampros@cov.com
Jennifer L. Levi, jlevi@glad.org
Amie Medley, Amie.Medley@doj.ca.gov
Colleen Melody, colleen.melody@atg.wa.gov
Matthew Miller, MMiller@foleyhoag.com

27

Shannon Minter, sminter@nclrights.org
Amy Quartarolo, amy.quartarolo@lw.com
Thomas E. Redburn, tredburn@lowenstein.com
Peter C. Renn, prenn@lambdalegal.org
Daniel I. Siegfried, daniel.siegfried@kirkland.com
Meg Slachetka, MSlachetka@lowenstein.com
Chris Stoll, CStoll@nclrights.org
Jason Sykes, jason@newmanlaw.com
Dixie Tauber, Dixie.Tauber@lw.com
Harrison White, harrison.white@lw.com


Dated: May 14, 2020                          Respectfully submitted,

                                             JOSEPH H. HUNT
                                             Assistant Attorney General
                                             Civil Division

                                             ALEXANDER K. HAAS
                                             Director, Federal Programs Branch

                                             ANTHONY J. COPPOLINO
                                             Deputy Director, Federal Programs
                                             Branch

                                             GRACE X. ZHOU
                                             (N.Y. Bar No. 5623681)
                                             CHRISTOPHER D. EDELMAN
                                             ANDREW E. CARMICHAEL
                                             Trial Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             1100 L Street, NW
                                             Washington, DC 20005
                                             Tel: (202) 616-8267
                                             Email: grace.x.zhou@usdoj.gov